The Hon. Richard A. Jones

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

MATTHEW S. LYONS, a married man as his separate estate,

          Plaintiff,

vs.

HOMECOMINGS FINANCIAL, LLC, a limited liability company; and AURORA LOAN SERVICES, LLC, a limited liability company,

          Defendants.

NO.  2:10-cv-584 RAJ

FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF TRUTH IN LENDING ACT AND WASHINGTON CONSUMER PROTECTION ACT

JURY TRIAL DEMANDED

COMES NOW Plaintiff Matthew S. Lyons ("Lyons"), and for his First Amended Complaint alleges as follows:

### PARTIES

1.    Plaintiff Lyons is a married man, and as his separate estate is the owner of real property located at 7115 Olympic View Drive, Edmonds, Washington (the "real property").

2.    Defendant Homecomings Financial, LLC ("Homecomings") is a Delaware limited liability company doing business in Snohomish County, Washington, and is the beneficiary of a

Berry&Beckett

1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

Deed of Trust on Lyons' real property.

3.     Defendant Aurora Loan Services, LLC ("Aurora") is a Delaware limited liability company doing business in Snohomish County, Washington, and is the beneficiary of a Deed of Trust on Lyons' real property.

## JURISDICTION AND VENUE

4.     This court has jurisdiction of the subject matter of this action because it asserts claims arising under the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the events and  omissions giving rise to the claims asserted herein arose in this district, and the defendants are subject to personal jurisdiction in this district.

## FACTS

6.     Plaintiff Lyons did not complete high school and has learning disabilities.  He has a less than average IQ.  The real property that is the subject of this action is Mr. Lyons' sole residence and was formerly owned by his parents.

7.     In or about December 2006, Lyons was contacted by David Kamai, a mortgage broker with a King County, Washington mortgage company, A+ Mortgage, Inc.  Mr. Kamai told Lyons that Kamai could arrange a home refinance for Lyons that would allow him to lower his monthly loan payment.  Kamai offered to obtain a refinance home loan for Lyons, and Lyons agreed to this offer.

8.     Kamai procured a loan for Lyons with Homecomings and at all times acted as Homecomings' agent.  Kamai told Lyons that the loan he had procured for Lyons was a thirty-year loan for $292,000 with a fixed interest rate of 7%, and that his monthly loan payments would be



1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

1  about $1,000.

2
3       9.      Sometime after Kamai initially contacted Lyons and before February 8, 2007,

4  Kamai told Lyons that in order to complete the loan, Lyons would have to pay off a child support

5  lien on the property.  Kamai told Lyons that rather than increase the amount of the loan he had

6
7  procured, he could place another smaller loan to be secured by a second deed of trust on his

8  property.  Kamai told Lyons that this loan would be for $50,000; would have an interest rate of

9  7%; and would be paid off in ten years.  Kamai did not tell Lyons how much the monthly payment

10
11  on this loan would be.  Between the first and second loans, Kamai arranged loans from

12  Homecomings that resulted in encumbrances in favor of Homecomings on Lyons' home of over

13
14  $350,000.  The first loan was for $ 292,000, and the second loan was for $63,500.  Kamai did not

15  tell Lyons that the loan for $292,000 was a negatively amortizing loan, and that the initial interest

16  rate was 7.75% and would later increase.  Kamai did not tell Lyons that if Lyons paid only the

17
18  minimum payment due on the loan, there would be no reduction of principal and that, in fact, the

19  principal amount of the loan would increase.  In fact, Kamai led Lyons to believe that the required

20  Minimum Payment under the Note would include an amount that would reduce the principal

21
22  balance due on it.

23       10.     Kamai also did not tell Lyons that the interest rate on the second loan for $63,500

24
25  was 13.375%; that the initial required monthly payment would pay interest only on the loan; that

26  the required monthly payment would increase in February 2012, and that if Lyons made the

27  required minimum payments on the loan, the loan would not be paid off until February 13, 2032,

28
29  at which time the remaining amount due on the loan would be due.

30       11.     On or about February 8, 2007, Kamai met with Lyons to sign the final loan



1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

documents. Kamai did not provide Lyons a set of the loan papers before he signed the final documents, and Kamai told Lyons he didn't need to have an attorney review them. Kamai told Lyons where to sign the papers, and Lyons signed the documents where Kamai told him to sign. Kamai did not provide Lyons a set of the loan documents.

12.     On or about February 8, 2007, Plaintiff executed two Promissory Notes in favor of Homecomings. The first Note was in the principal amount of $292,000, and was secured by a first Deed of Trust on Plaintiff's residence. The Promissory Note did not inform Lyons that if he paid only the required Minimum Payment, negative amortization on the loan, and monthly increases to the principal balance due on the Note, were certain to occur. The second Note was in the principal amount of  $63,500, and was secured by a second Deed of Trust in favor of Homecomings. Copies of the Promissory Notes are attached as Exhibits 1 and 2, respectively. A copy of the Deed of Trust securing the First Deed of Trust is attached as Exhibit 3. Lyons agrees that he signed the Deed of Trust but contends that the initials and signatures on the Deed of Trust and Adjustable Rate Rider of Jasmine del Rosario, Lyons' wife, have been forged.

13.     Between the two Homecomings loans, with necessary monthly escrow payments for taxes and insurance, Lyons' minimum monthly home loan payments were over $2,100, significantly more than they had been with Lyons' previous lender. Payment of the minimum monthly payments required on the loans would not result in the reduction of the principal balance due on them.

14.     On February 8, 2007, the same day Lyons signed the Promissory Notes and Deeds of Trust, Lyons was provided Truth in Lending Disclosure Statements for the $ 292,000 and $63,500 loans. Copies of those Disclosure Statements are attached as Exhibits 4 and 5,



Berry&Beckett LLP

1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

respectively.  The Disclosure Statements contained schedules of the amounts that Lyons was required to pay.  Lyons agrees that he signed the Disclosure Statements but contends that the initials and signatures on the Disclosure Statements of Jasmine del Rosario, Lyons' wife, have been forged.

15.     Lyons made his required payments as required by the Promissory Notes and the Disclosure Statements until September 2008.  By that time, Aurora was the servicer for the $292,000 loan.  Lyons had a dispute with Aurora concerning whether he had made the September 2008 payment on the $292,000 loan.  Aurora instituted proceedings to non-judicially foreclose the first Deed of Trust on Lyons' property pursuant to RCW Chapter 61.24.  In March 2009, the Successor Trustee under the first Deed of Trust recorded a Notice of Trustee's Sale pertaining to Lyons' real property, and served Lyons with a copy of the Notice of Trustee's Sale.  Thereafter, Lyons retained legal counsel to investigate whether Aurora had properly credited Lyons' September 2008 payment.

16.     Because Lyons had received no loan or transaction documents at the time he had signed the two Notes, Lyons, through legal counsel, attempted to obtain records pertaining to Lyons' refinance transaction of February 2007.  Through legal counsel, Lyons requested copies of his loan documents from A+ Mortgage, Homecomings, and Aurora.  A+ Mortgage had ceased doing business prior to this time and its authority to operate as a mortgage broker in Washington State had been revoked by the Washington State Department of Financial Institutions.  It did not respond to Lyons' request for documents.  Homecomings also did not respond to the request for Lyons' loan documents.  Lyons' request for documents was made to Aurora for documents on April 9, 2009; Aurora provided copies of documents in its possession related to the February 2007



1708 Bellevue Ave.
Seattle, WA 98122
Tel 206.441.5444
Fax 206.838.6346

loan transactions on June 1, 2009. The documents provided by Aurora are not all of the documents related to the loans obtained by Lyons, and Lyons has still not received all of the documents related to the loans.

17.     Until Lyons received the documents from Aurora, on June 1, 2009, he did not know the name of the escrow company where the loan transactions were finalized in February 2007. Upon receiving the loan documents, he learned that the escrow company was Newcastle Escrow. Prior to this time, Newcastle Escrow, had ceased doing business and proceedings were then underway by Washington's Department of Financial Institutions to revoke Newcastle Escrow's authority to conduct escrow business. Accordingly, Lyons' escrow and transaction documents were not available from Newcastle Escrow.

18.     The documents presented to Lyons prior to or at the time he signed the two Promissory Notes in February 2007 were confusing and contained contradictory provisions. Until Lyons received the documents from Aurora on June 1, 2009, he did not know what documents were presented to him prior to or at the time he signed the two Promissory Notes in favor of Homecomings in February 2007. Because Lyons has still not received all of the documents related to the Promissory Notes, Lyons still is unaware of all of the documents that were presented to him prior to or at the time he signed the Promissory Notes.

19.     Upon receipt of the documents from Aurora on June 1, 2009, Lyons learned that the loan he had obtained from Homecomings for $292,000 was not in fact a thirty-year fixed loan with a 7% interest rate, but was in fact a negatively amortizing loan with an initial interest rate of 7.75%, and the monthly loan payments that Kamai had told Lyons would be applied to principal and interest were in fact less than the interest that accrued on the loan each month. This monthly



1708 Bellevue Ave.
Seattle, WA 98122
Tel 206.441.5444
Fax 206.838.6346

shortage was being added to the principal balance due on the loan.  Neither Kamai nor

Homecomings had informed Lyons that the $292,000 loan was a negatively amortizing loan or

explained to him what a negatively amortizing loan is.  Upon receiving the documents from

Aurora on June 1, 2009, Lyons obtained confirmation that Kamai and Homecomings had told him

that his monthly payments on the $292,000 loan would be applied to principal and interest; the

"First Payment Notice" dated February 8, 2007 states that Lyons' "initial monthly payment" of

$1,153.75 (exclusive of property tax and hazard insurance deposits) would be applied to

"Principal and Interest."  A redacted copy of the First Payment Notice is attached as Exhibit 6.

20.     Aurora is now the owner and holder of the $292,000 Note, and is the beneficiary of

the Deed of Trust which secures the $292,000 Note.  As successor to the Note and beneficiary's

interest in the Deed of Trust, Aurora is liable for Homecomings' violations of the Truth in

Lending Act related to the $292,000 loan and Note, pursuant to 15 U.S.C. § 1641(a)(1).

### EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

21.     This is an action to recover money damages for Homecomings' violations of the

Truth in Lending Act.  While normally the statute of limitations for such claims runs one year

after the transaction underlying the alleged violation is consummated, the doctrine of equitable

tolling suspends the limitations period under the appropriate circumstances.  In this case, Lyons

did not have the transaction documents and had no way to acquire them, until Aurora provided

some of them on June 1, 2009.  The representations in the documents were contradictory and

confusing.  Until Lyons received the documents from Aurora, he had no means to discover the

fraud or nondisclosures that form the basis for his damage claims, and could not determine

whether or not Homecomings had violated the Truth in Lending Act.  Indeed, Lyons still has not

Berry&Beckett

1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

received all of the documents pertaining to the transactions.  Accordingly, the Court should conclude that the one-year statute of limitations applicable to claims for money damages under the Truth in Lending Act was suspended until no earlier than June 1, 2009, and that this action was commenced within one year of the suspension date.

## FIRST CAUSE OF ACTION:
### TILA VIOLATIONS PERTAINING TO $292,000 LOAN

22.     The Disclosure Statement for the $ 292,000 loan and the Promissory Note for the $292,000 loan are inconsistent or incorrect in at least the following ways:

a.     The interest rate shown on the Promissory Note is 7.75%, and it is due to increase at the end of five years from the date it was signed.  The Disclosure Statement states that the Annual Percentage Rate for the loan is 7.7147%, which is less than the initial five-year interest rate provided by the Note.

b.     Pursuant to the Note, the required payment remained at $ 1,153.75 until April 1, 2012.  Pursuant to the Disclosure Statement, the required payment increases to $2,163.75 on June 1, 2011.

c.     The amount of the Promissory Note is $ 292,000.  The "Amount Financed" shown on the Disclosure Statement is $282,687.26.  Upon information and belief, this amount is incorrect.

d.     The Promissory Note and Disclosure Statement do not disclose the certainty of negative amortization in the event Lyons paid the amounts shown in the Disclosure Statement's Payment Schedule and the Note's required Minimum Payments.

23.     With respect to the $ 292,000 loan, Defendant Homecomings violated TILA in at least the following ways:



1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

a.   Homecomings violated 12 C.F.R. § 226.19(b)(2)(vii) by failing to disclose that negative amortization was certain to occur if Lyons made the payments shown on the Disclosure Statement's Payment Schedule and shown in the Note as the required monthly Minimum Payment.

b.   Homecomings violated 12 C.F.R. § 226.19(a)(2)(ii) by failing to provide the Disclosure Statement attached as Exhibit 4 hereto at least three business days prior to Lyons' consummation of the transaction.

c.   Homecomings violated 12 C.F.R. § 226.17(c) because the Disclosure Statement does not accurately reflect the terms of the legal obligation of the parties, in the ways itemized above in ¶ 22(a)-(c).

24.   Lyons is entitled to recover his actual damages against Homecomings and Aurora for these violations in an amount to be proven at trial, and statutory damages against Homecomings and Aurora in the amount of no less than $4,000.00.

## SECOND CAUSE OF ACTION:
## VIOLATIONS OF WASHINGTON'S CONSUMER PROTECTION ACT

25.   Homecomings' offering and sale of a negatively amortizing loan to Lyons, and its failure to provide Lyons with the disclosures required by the Truth in Lending Act, was deceptive, occurred in trade or commerce, had the capacity to deceive a substantial portion of the public, caused damages to Lyons, and violated Washington's Consumer Protection Act. Lyons is entitled to recover his actual damages, and trebled damages under RCW 19.86.090, for such violations, in an amount to be proven at trial.



## THIRD CAUSE OF ACTION:
## ATTORNEYS' FEES AND COSTS

26.     Lyons is entitled to recover his reasonable attorneys' fees and costs of suit herein, pursuant to 15 U.S.C. § 1640(a)(3) and RCW 19.86.090.

### JURY DEMAND

27.     Plaintiff requests a trial by jury of the claims asserted herein.

WHEREFORE, Plaintiff prays for judgment as follows:

1.     For judgment against Homecomings and Aurora, in amounts to be proven at trial.

2.     For judgment against Homecomings for treble damages for each violation of Washington's Consumer Protection Act, up to $25,000 per violation.

3.     For judgment for reasonable attorney's fees and costs of suit against Homecomings and Aurora pursuant to 15 U.S.C. § 1640(a)(3), and against Homecomings pursuant to RCW 19.86.090.

4.     For judgment for statutory costs.

5.     For pre-judgment interest on all liquidated sums awarded at the highest allowable rate, and post-judgment interest on the entire judgment at the highest allowable rate.

6.     For permission to amend his pleadings to conform to the proof presented at trial; and

7.     For such other and further relief as the Court deems just and equitable.

DATED this 15th day of July, 2010.

BERRY & BECKETT, PLLP

/s/ Guy Beckett
Guy W. Beckett, WSBA #14939
Attorneys for Plaintiff



1708 Bellevue Ave.
Seattle, WA  98122
Tel 206.441.5444
Fax 206.838.6346

FIRST AMENDED COMPLAINT - 10

EXHIBIT 1

# ADJUSTABLE RATE NOTE
## 5 Year Fixed Rate Payment Option

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

FEBRUARY 8TH, 2007                BELLEVUE                    WASHINGTON
[Date]                            [City]                      [State]

7115 OLYMPIC VIEW DRIVE, EDMONDS, WA 98026
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   292,000.00   (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is  HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of   7.7500   %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of   MARCH, 2012   , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C) Interest Rate Limit

My interest rate will never be greater than   9.9500   %.

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE FOURTH percentage point(s) ( 2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on APRIL 1ST, 2007. Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MARCH 1ST, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 188 106TH AVENUE NE, SUITE 600, BELLEVUE, WA 98004 or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $ 1,153.75, until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of APRIL, 2012, and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

**(G) Required Full Payment**

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

**(H) Payment Options**

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii)   **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii)   **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4.  NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of   15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.0000   % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
                        -Borrower                               -Borrower
MATTHEW S LYONS

_____ (Seal)          _____ (Seal)
                        -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                               -Borrower

Without Recourse
Pay to the Order of                                      *[Sign Original Only]*

Yemane B. Mebrahtu
Assistant Secretary
Homecomings Financial, LLC
A Delaware Corporation

# PREPAYMENT ADDENDUM TO NOTE

FEBRUARY 8, 2007
[Date]

BELLEVUE          WASHINGTON
[City]            [State]

7115 OLYMPIC VIEW DRIVE, EDMONDS, WA 98026
[Property Address]

FOR VALUE RECEIVED, the undersigned ("Borrower") agree(s) that the following provisions shall be incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed of even date herewith (the "Security Instrument") executed by Borrower, as trustor, in favor of HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.) (the "Note") of even date herewith, executed by Borrower in favor of Lender and secured by the Security Instrument. To the extent that the provisions of this Prepayment Addendum to Note (the "Addendum") are inconsistent with the provisions of the Note and/or the Security Instrument, the provisions of the Addendum shall prevail over and shall supersede any such inconsistent provisions of the Note and/or the Security Instrument and/or the Note.

The Note is amended to read as follows:

**"BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at a time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

Except as provided below, I may make full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

If within thirty-six ( 36 ) months from the date of execution of the Security Instrument I make a full Prepayment, or in certain cases a partial Prepayment, and the total of such Prepayment(s) in any 12-month period exceeds twenty percent ( 20 %) of the original Principal amount of this loan, I will pay a Prepayment charge in an amount equal to the payment of six ( 6 ) months' advance interest on the amount by which the total of my Prepayment(s) within that 12-month period exceeds twenty percent (20 %) of the original Principal amount of the loan.

NOTICE TO THE BORROWER

Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement."

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Borrower - MATTHEW S. JONES                                    (Seal)
Borrower -

Borrower -                                    (Seal)
Borrower -

Borrower -                                    (Seal)
Borrower -

Borrower -                                    (Seal)
Borrower -

PREPAYMENT ADDENDUM TO NOTE
MULTI-STATE
MP-2251-MS (11/98/MS)                                    Page 1 of 1

EXHIBIT 2

02/14/07  09:30 FAX 425 482 9576          NEWCASTLE ESCROW                    NO. 5566   P. 5/19   ☒005

# NOTE - Initial Period Interest Only

FEDERAL WAY ........................., 2002
........................................................................
Date                              Property Address

.................................. WASHINGTON .................................
City                              State                        Zip Code

## 1. DEFINITIONS

The headings of each section are for convenience only and are not to be used in interpreting the text of this section. "I" means the terms that apply to this loan. "I", "me" or "my" means each Borrower who signs this Note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this Note (together referred to as "us" and "we"). "You" or "your" means the Lender and its successors and assigns.

☒ If checked, this agreement is made in accordance with Chapter 31 of the Revised Code of Washington.

FOR VALUE RECEIVED, I promise to pay you, or your order, the PRINCIPAL sum of ........................
..................................................... Dollars $ ...........................

## 2. INTEREST

I agree to pay interest on the outstanding principal balance at the rate of ..........% per year until the first Payment date. The interest rate I will pay during the Initial five year period, may increase or decrease from time to time, until paid in full. The principal sum and other charges on this loan will never exceed the highest rate or charge allowed by law for this loan.

## 3. PAYMENTS

I agree to pay this note in monthly payments. I will make monthly payments on the FIRST .......... day of each month, beginning on .........., 2002. During the Initial five year period, my monthly payments will consist of the interest that accrues. My monthly payments during the Initial Period will be $ ..............., until ........., 2007, which is called the "First Adjustment Period". Before applying my payments every month, I will make them at ..........................

## 4. PAYMENTS

I will make my monthly payments at P.O. ........................

## 5. SECURITY

My obligations under this note are separately secured by a Mortgage dated the same date as this note.

## 6. SECURITY

Any present or future agreement securing any other debt I owe you also will secure the payment of this loan.

## 7. PAYMENTS BY LENDER

If you are authorized to pay, on my behalf, charges I am obligated to pay (such as real estate taxes, or insurance premiums, and may earn such fees on insurance products, and may earn commissions or fees on any insurance products) will earn commissions or fees on any insurance products.

## 8. REAL ESTATE OR INSURANCE SECURITY

FEB.14.2007 09:31 FAX 425 462 9376   NEWCASTLE ESCROW   NO.5566   P. 6/19   ☒010

**9. ASSUMPTION.** This note and any document securing it cannot be assumed by someone buying the secured property from me. This will be true unless you agree in writing to the contrary. Without such an agreement, if the property or any interest in it is sold or transferred, I will be in default on this loan. You may proceed against me under any of the remedies in the "REAL ESTATE OR RESIDENCE SECURITY" paragraph above, including any due upon sale clauses in the security documents, or under any other terms.

**10. DEFAULT.** Subject to any limitations in the "REAL ESTATE OR RESIDENCE SECURITY" paragraph above, I will be in default on this loan if any of the following occur:

(a) I fail to make a payment on time or in the amount due;

(b) I fail to keep any promise or agreement I have made with you, including the promises and agreements in the "REAL ESTATE OR RESIDENCE SECURITY" paragraph above, if I am in default on this loan or any agreement securing this loan. You may:

**11. REMEDIES.** Subject to the limitations in the "REAL ESTATE OR RESIDENCE SECURITY" paragraph above, if I am in default on this loan or any agreement securing this loan, you may:

(a) Demand immediate payment of all I owe you under this loan (principal, earned interest and all other agreed charges I owe you immediately);

(b) Demand more security or new parties obligated to pay this loan (or both) in return for not using any other remedy;

(c) Make a claim for any and all insurance benefits or refunds that may be available on my default;

(d) Use any remedy you have under state or federal law and

(e) Use any remedy given to you in any agreement securing this loan.

By choosing any one or more of these remedies, you do not give up your right to use another remedy later. By deciding not to use any remedy should I be in default, you do not give up your right to consider the event a default if it happens again.

**12. ATTORNEYS' FEES AND COSTS.** I agree to pay all your costs, including reasonable attorneys' fees that you incur in legal proceedings to collect or enforce this debt should I default. I will pay you these amounts if I agree to pay you all reasonable costs you incur in trying to realize on any security. This provision shall apply if I file for relief under the bankruptcy rule or law of the United States, or if such position or other claims for relief is filed against me by another.

**13. WAIVER.** I waive (to the extent permitted by law) demand, presentment, protest, notice of dishonor and notice of protest. This means that any obligation also agreed to pay it. You may, without notice, release any party, give up any right you may have against any party or extend or renew this loan for any or all of us. I give up any right I may have to require you to proceed against anyone before proceeding against me. I agree that you do not have to notify me that this loan has not been paid. You may add all amounts owed you under this loan, and if I release any security and I will still be obligated to pay this loan.

**14. OBLIGATIONS INDEPENDENT.** I understand that my obligations on pay all of the amounts owed under this loan are independent of the obligations of any other person who has also agreed to pay it. You may, without notice, release any one of us, give up any right you may have against any one of us, or extend or renew this loan for any or all of us. If you do any of these things, it will not affect my duty to pay this loan. You may add all amounts owed you under this loan, and if I release any security and I will still be obligated to pay this loan.

**15. CREDIT INFORMATION.** I agree that from time to time you may receive credit information about me from others, and report information about my account to credit reporting agencies and to those who may properly receive such information.

**16. PURCHASE MONEY LOAN.** If this is a purchase money loan, you may include the name of the seller on the check or draft for this loan.

---

I understand that for the Interest Only Period my monthly payments will not reduce the principal balance on my loan. After 5 years, my monthly payments of both principal and interest, but will not be reduced. My monthly payments after the Interest Only Period will cause my principal balance to not be reduced. As a result, I will give you financial statements or information provided to me by you. I agree that you will not be liable for any claims arising from the use of information provided to you by others, and have accept and complete, and will be higher unless I have made additional payments to reduce the principal balance.

---

## SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE. I have received a copy of this note.

☐ I do not sign this Agreement before you read it.

**NOTICE TO CONSUMER.** If you read it. 2. You are entitled to a copy of this Agreement.

X _____   Date _____
(Borrower)

X _____   Date _____
(Borrower)

MATTHEW D LYNCH

Date _____

2-8-07
Date

(Sign Original Only)

©1994, 1991, 13me Systems, Inc., St. Cloud, MN Form MPCCReSumm 24/07/2006
MPFG4EG06 (09/20/06) / 047-2472224-4

Page 2 of 21

EXHIBIT 3



200702150585   22   PGS
02/15/2007 1:29pm $54.00
SNOHOMISH COUNTY, WASHINGTON

Return To
Homecomings Financial
One Meridian Crossing, Ste  100
Minneapolis  MN  55423
Loan Number  047-247933-6

Assessor's Parcel or Account Number   27041700201200, #2
Abbreviated Legal Description   A PTN OF SECTION 17, TOWNSHIP 27, RANGE 04E

[Include lot, block and plat or section, township and range]          Full legal description located on page  3
Trustee   COMMONWEALTH LAND TITLE
                                                                  Additional Grantees located on page  3

---

[Space Above This Line For Recording Data]

## DEED OF TRUST 22|54.⁰⁰

MIN 100062604724793361

COMMONWEALTH LAND TITLE
REF: 202701169-rm



DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21  Certain rules regarding the usage of words used in this document are
also provided in Section 16
(A) "Security Instrument" means this document, which is dated   FEBRUARY 8TH, 2007
together with all Riders to this document
(B) "Borrower" is
MATTHEW S LYONS, A MARRIED MAN AS HIS SEPARATE ESTATE

Borrower is the trustor under this Security Instrument
(C) "Lender" is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL
    NETWORK, INC )

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3048  1/01
MFWA7770 (09/2006) / 047-247933-6
VMP ®-6A(WA) (0012) 01
Page 1 of 15          Initials  M.L.  S.L.
     VMP Mortgage Solutions, Inc

Lender is a   LIMITED LIABILITY COMPANY
organized and existing under the laws of   DELAWARE
Lender's address is   188 106TH AVENUE NE, SUITE 600
BELLEVUE, WA 98004
(D) "Trustee" is   COMMONWEALTH LAND TITLE

(E) "MERS" is Mortgage Electronic Registration Systems, Inc   MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns   MERS is the beneficiary
under this Security Instrument   MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P O Box 2026, Flint, MI 48501-2026, tel   (888) 679-MERS
(F) "Note" means the promissory note signed by Borrower and dated   FEBRUARY 8TH, 2007
The Note states that Borrower owes Lender   TWO HUNDRED NINETY TWO THOUSAND AND
NO/100                                                                                              Dollars
(U S $   292,000 00                  ) plus interest   Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   MARCH 1ST, 2037
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property "
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower   The following
Riders are to be executed by Borrower [check box as applicable]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account   Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers
(M) "Escrow Items" means those items that are described in Section 3
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for  (i)
damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the
Property, (iii) conveyance in lieu of condemnation, or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument

VMP -6A(WA) (0012) 01                    Page 2 of 15                    Initials _M.J._  _&R_           Form 3048  1/01
MFWA7770 (09/2006) / 047-247933-6

**(Q)** "RESPA" means the Real Estate Settlement Procedures Act (12 U S C  Section 2601 et seq ) and its implementing regulation, Regulation X (24 C F R  Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

**(R)** "Successor In Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS  This Security Instrument secures to Lender  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the                    COUNTY                [Type of Recording Jurisdiction]
of  SNOHOMISH                                         [Name of Recording Jurisdiction]
Legal description attached hereto and made a part hereof

Parcel ID Number   27041700201200                                which currently has the address of
7115 OLYMPIC VIEW DRIVE                                                                          [Street]
EDMONDS                                           [City] , Washington  98026              [Zip Code]
("Property Address")

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property  All replacements and additions shall also be covered by this Security Instrument  All of the foregoing is referred to in this Security Instrument as the "Property " Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

VMP®  -6A(WA) (0012) 01                     Page 3 of 15          Initials _m&_ _&n._                Form 3048  1/01
MFWA7770 (09/2006) / 047-247933-6

of record  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property

UNIFORM COVENANTS  Borrower and Lender covenant and agree as follows

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note  Borrower shall also pay funds for Escrow Items pursuant to Section 3  Payments due under the Note and this Security Instrument shall be made in U S currency  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender  (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity, or (d) Electronic Funds Transfer

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority  (a) interest due under the Note, (b) principal due under the Note, (c) amounts due under Section 3  Such payments shall be applied to each Periodic Payment in the order in which it became due  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property, (b) leasehold payments or ground rents on the Property, if any, (c) premiums for any and all insurance required by Lender under Section 5, and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10  These items are called "Escrow Items "  At origination or at any time during the term of the Loan, Lender may require that Community

Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time Any such waiver may only be in writing In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9 If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires  What Lender requires pursuant to the preceding sentences can change during the term of the Loan  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably  Lender may require Borrower to pay, in connection with this Loan, either  (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense  Lender is under no obligation to purchase any particular type or amount of coverage  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee  Lender shall have the right to hold the policies and renewal certificates  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender  Lender may make proof of loss if not made promptly by Borrower  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened  During such repair and restoration period, Lender shall have the right to

hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

   **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

   Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

   **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property Lender's actions can include, but are not limited to (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court, and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed Borrower is not a party to the Mortgage Insurance

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums)

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance " Further

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value  Any balance shall be paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer") (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's

-6A(WA) (0012) 01                     Page 10 of 15          Initials _m L_  _R_        Form 3048  1/01
MFWA7770 (09/2006) 7° 047-247933-6

notice address if sent by other means  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender  Borrower shall promptly notify Lender of Borrower's change of address  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure  There may be only one designated notice address under this Security Instrument at any one time  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument

**16.  Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision

As used in this Security Instrument  (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action

**17.  Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument

**18.  Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

**19.  Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument  Those conditions are that Borrower  (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender  (a) cash, (b) money order, (c)

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred However, this right to reinstate shall not apply in the case of acceleration under Section 18

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20

21. Hazardous Substances. As used in this Section 21 (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection, (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law, and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products)

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law Nothing herein shall create any obligation on Lender for an Environmental Cleanup

NON-UNIFORM COVENANTS Borrower and Lender further covenant and agree as follows

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law

25. Use of Property. The Property is not used principally for agricultural purposes

26. Attorneys' Fees. Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it

Witnesses



_____   Matthew Lyons   (Seal)
                          MATTHEW S LYONS      -Borrower

_____   _____   (Seal)
                          Jasmin del Rosario   -Borrower

_____   _____
                  (Seal)                      (Seal)
                  -Borrower                    -Borrower

_____   _____
                  (Seal)                      (Seal)
                  -Borrower                    -Borrower

_____   _____
                  (Seal)                      (Seal)
                  -Borrower                    -Borrower

STATE OF WASHINGTON
County of Snohomish                                      } SS:

On this day personally appeared before me   MATTHEW S LYONS, A MARRIED MAN AS HIS
SEPARATE ESTATE    and Jasmin del Rosario

to me known to be the individual(s) described in and who executed the within and foregoing instrument,
and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the
uses and purposes therein mentioned

GIVEN under my hand and official seal this        8TH        day of    FEB .        2007



Hank J. Rypka

Notary Public in and for the State of Washington, residing at
SEATTLE, WA .

My Appointment Expires on   7-21-09

## EXHIBIT "A"

THE NORTH 87.5 FEET OF THE SOUTH 175 FEET OF THAT PORTION OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 27 NORTH, RANGE 4 EAST, W M

LYING NORTHWESTERLY OF EDMONDS ROAD (WHICH RUNS IN NORTHEASTERLY DIRECTION ACROSS THE SOUTHEAST QUARTER , AS MEASURED ALONG THE WEST LINE OF SAID SUBDIVISION).

EXCEPT THE WEST 90 FEET THEREOF

SITUATE IN THE CITY OF EDMONDS, COUNTY OF SNOHOMISH, STATE OF WASHINGTON



# ADJUSTABLE RATE RIDER
## 5 Year Fixed Rate Payment Option

THIS ADJUSTABLE RATE RIDER is made this 8TH day of FEBRUARY, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC )

("Lender") of the same date and covering the property described in the Security Instrument
and located at
      7115 OLYMPIC VIEW DRIVE
      EDMONDS, WA 98026
            [Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST
RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE
AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE
THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE
AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT
STATED IN THE NOTE**

**ADDITIONAL COVENANTS** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows

Lender or anyone who takes the Note by transfer and who is entitled to receive payments
under the Note is called the "Note Holder."

## A  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows

## 2  INTEREST
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been
paid  I will initially pay interest at a yearly rate of   7 7500   % The interest rate I
will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note
**(B) Interest Rate Change Dates**
The interest rate I will pay may change on the first day of  MARCH, 2012
and on that day every month thereafter  Each date on which my interest rate could change is

**5 YEAR PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 05/06**
**7754167 (0402) 01**     VMP Mortgage Solutions, Inc     Initials 
MFCD6290 (10/2006) / 047 247933 6

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3

**(C) Interest Rate Limit**

My interest rate will never be greater than 9 9500 %

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h 15)" (the "Monthly Yields") The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index"

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE FOURTH percentage point(s) ( 2 2500 %) to the Current Index The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%) Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on APRIL 1ST, 2007 Each of these dates is called a "Payment Due Date" I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MARCH 1ST, 2037 , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date"

I will make my monthly payments at 188 106TH AVENUE NE, SUITE 600, BELLEVUE, WA 98004 or at a different place if required by the Note Holder

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U S $ 1,153 75 , until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under the Note, the difference will be added to my Principal amount as provided in Section 3(E) below My initial Minimum Payment may not be sufficient to cover the interest due.

7754167 (0402) 01                    Page 2 of 6                    Initials _mf_ _ff_

MFCD6280 (10/2006) / 047 247933 6

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of APRIL, 2012          , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

7754167 (0402) 01
MFCD6200 (10/2006) / 047 247933-6

Page 3 of 6

Initials _ML_ _[initials]_

**(F) Limit on My Unpaid Principal, Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed  Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount  In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date  This amount will be my new Minimum Payment  This means that my Minimum Payment may change monthly......This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date

**(G) Required Full Payment**

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my monthly payment changes again

**(H) Payment Options**

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options "  I may be given the following Payment Options

   (i)   **Interest Only Payment**  the amount that would pay the interest portion of the monthly payment at the current interest rate  The Principal balance will not be decreased by this Payment Option  This payment option will not be available beginning with the 121st Payment Due Date

   (ii)   **Fully Amortized Payment**  the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month  This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

   (iii)   **15 Year Amortized Payment**  the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month  This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note

**7754167 (0402) 01**
MFCD6290 (10/2006) / 047 247933-6

Page 4 of 6

Initials  _m&._  _fd_



Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4  NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**7754167 (0402).01**
MFCD8280 (10/2008) / 047 247833 6

Page 5 of 6

Initials  *M&*  *gk*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                _____ (Seal)
                    -Borrower                                      -Borrower
MATTHEW S LYONS

_____ (Seal)                _____ (Seal)
Jasmin del Rosario  -Borrower                                      -Borrower

_____ (Seal)                _____ (Seal)
                    -Borrower                                      -Borrower

_____ (Seal)                _____ (Seal)
                    -Borrower                                      -Borrower

**7754167 (0402) 01**                          Page 6 of 6
MFCD6290 (10/2006) / 047 247933 6

EXHIBIT 4

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

Borrower:

MATTHEW S LYONS
7115 OLYMPIC VIEW DRIVE
EDMONDS, WA 98026

Creditor:

HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS
FINANCIAL NETWORK, INC.)
188 106TH AVENUE NE, SUITE 600
BELLEVUE, WA  98004

Loan Number: 047-247933-6

Date: 02/08/2007

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.7147% | $553,634.26 | $282,687.26 | $836,321.52 |

Your payment schedule will be:

| No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin |
|---|---|---|---|---|---|---|---|---|
| 50 | 1153.75 | 04/01/2007 | | | | | | |
| 10 | 2163.82 | 06/01/2011 | | | | | | |
| 60 | 2024.22 | 04/01/2012 | | | | | | |
| 239 | 2648.10 | 04/01/2017 | | | | | | |
| 1 | 2646.72 | 03/01/2037 | | | | | | |

VARIABLE RATE:  Your loan contains a variable-rate feature.  Disclosures about the variable-rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:   * Property You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY:  You are giving a security interest in real property you already own. Property Address: 7115 OLYMPIC VIEW DRIVE, EDMONDS, WA  98026

LATE CHARGE:  If a payment is more than 15 days late, you will be charged 5 % of the overdue payment of principal and interest.

PREPAYMENT:  If you pay off your loan early,  * You may have to pay a penalty. * You will not be entitled to a refund of part of the finance charge.

ASSUMPTION:  Someone buying your property may assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

MATTHEW S LYONS          2-8-07
                         DATE

Jaslin  del Rosario          2-8-07
                         Date

EXHIBIT 5

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

Borrower:

MATTHEW S LYONS
7115 OLYMPIC VIEW DRIVE
EDMONDS, WA 98026

Creditor:

HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS
FINANCIAL NETWORK, INC.)
188 106TH AVENUE NE, SUITE 600
BELLEVUE, WA  98004

Loan Number: 047-247934-4

Date:  02/08/2007

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 13.5169% | $162,199.42 | $62,900.00 | $225,099.42 |

Your payment schedule will be:

| No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin |
|---|---|---|---|---|---|---|---|---|
| 60 | 707.76 | 03/13/2007 | | | | | | |
| 239 | 760.98 | 03/13/2012 | | | | | | |
| 1 | 759.60 | 02/13/2032 | | | | | | |

INSURANCE: The following insurance is required to obtain credit:   * Property
You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY:  You are giving a security interest in real property you already own.
Property Address: 7115 OLYMPIC VIEW DRIVE, EDMONDS, WA  98026

LATE CHARGE:  If a payment is more than 15 days late, you will be charged 5 % of the
overdue payment of principal and interest.

PREPAYMENT:  If you pay off your loan early,   * You will not have to pay a penalty.
* You will not be entitled to a refund of part of the finance charge.

ASSUMPTION:  Someone buying your property cannot assume the remainder of your loan on the
original terms.

See your contract documents for any additional information about nonpayment, default, any
required repayment in full before the scheduled date, and prepayment refunds and penalties.

_Matthew Lyons_                    2 8 07
MATTHEW S LYONS                    DATE

_Jasmin del Rosario_               2 8 67
Jasmin del Rosario        Date

EXHIBIT 6

# FIRST PAYMENT NOTICE

FEBRUARY 8, 2007
Date

Loan Number

Dear Borrower:

We wish to take this opportunity to welcome you as a customer of HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.) and to provide you with the following information regarding your loan.

In accordance with the terms of the Note and Mortgage, your first monthly payment is due and payable on or before APRIL 1, 2007. All succeeding payments are due and payable on the first day of the month.

Your initial monthly payment will be as follows:

| | |
|---|---|
| Monthly Principal and Interest: | $ 1,153.75 |
| Monthly Property Tax Deposit: | $ 163.16 |
| Monthly Hazard Insurance Deposit: | $ 96.92 |
| Monthly Annual Assessment Amount: | $ |
| Monthly Flood Insurance Deposit: | $ |
| Monthly Mortgage Insurance Deposit: | $ |
| | $ |
| | $ |
| | $ |
| Total Initial Monthly Payment: | $ 1413.83 |

You will be provided with monthly payment coupons for your convenience. However, if your initial payment coupon has not arrived by the time you need to make your payment, please detach and mail the coupon below along with your check to the address indicated. Our mailing address for all correspondence is:

Homecomings Financial, LLC (f/k/a Homecomings Financial Network, Inc.)
P.O. Box 890036
Dallas, TX 75389
800-206-2901

Please include your loan number on all correspondence.

Please provide us with the following information in order for us to assure timely receipt of your monthly mortgage billing statements and to correspond with you on any other matters of importance. Please sign below and return to the mailing address provided above.

*Mailing Address/P.O. Box _____
(* indicate mailing address after loan settlement)

City, State & Zip Code _____

Present Telephone Number (include area code) _____

If I/We the Borrower(s) desire the mailing address to be different than the address of the Property indicated on the Deed of Trust, Borrower(s) must provide the correct mailing address. I/We certify the above mailing information to be true and correct and further agree to notify the holder of service of the note immediately of any change of address by certified mail, return receipt requested, to the above referenced address. No other knowledge, whether actual or constructive by the holder of the Note or any of its agents or employees, will be sufficient to put the holder of the Note on notice of any change of Borrower(s) mailing address and/or telephone number.

_Matthew Lyons_
MATTHEW S LYONS                    -Borrower                    _____    -Borrower

_____    -Borrower                    _____    -Borrower

........................................................................................................

## FIRST PAYMENT COUPON

NAME: MATTHEW S LYONS                         LOAN NUMBER: 047-247033-6
AMOUNT: $1,413.83                              DATE DUE: APRIL 1, 2007

A late charge can be assessed if payment is received at this designated location after the 15th calendar day following the due date indicated above.

Send payment to:                              Using overnight mail service, send payment to:
Homecomings Financial, LLC (f/k/a Homeco       Homecomings Financial, LLC (f/k/a Homecomings
Financial Network, Inc.)                       Financial Network, Inc.)
P.O. Box 78426                                 1820 E Sky Harbor Circle South
Phoenix, AZ 85062-8426                         Phoenix, AZ 85034-9700